## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JEFFREY GRONSKI #294193,

     *Plaintiff*,

v.

DAVID CLIFTON, MARY ANN
BULL-EHINGER, and KELLY M.
SIGLER,[1]

     *Defendants*.

_____/

CASE NO. 2:13-CV-13928

DISTRICT JUDGE BERNARD FRIEDMAN
MAGISTRATE JUDGE PATRICIA MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS CLIFTON AND BULL-EHINGER'S MOTION FOR SUMMARY JUDGMENT
### (Doc. 11)

### I.   RECOMMENDATION

For the reasons presented below, **IT IS RECOMMENDED** that Defendants Clifton and Bull-Ehinger's Motion for Summary Judgment be **GRANTED**.

### II.   REPORT

#### A.   Introduction

Plaintiff Jeffrey Gronski filed this *pro se* prisoner civil rights action under 42 U.S.C. § 1983 on September 13, 2013. (Doc. 1 at 1.) Plaintiff alleges that Defendants David Clifton and Mary Ann Bull-Ehinger were deliberately indifferent to his safety needs in violation of the Eighth Amendment by failing to prevent sexual assault/harassment from his psychologist Joell Morrill.[2]

---

[1]Defendant Sigler did not join in the motion since she did not execute a waiver of service until April 17, 2014, and therefore has until June 16, 2014 to file an answer to the complaint. (Doc. 20.)

[2] Joell Morrill is not named in this case because Plaintiff has reached a settlement with her separately. Stipulated Order of Dismissal at 1, *Gronski v. Morrill*, No. 5:12-cv-15191 (E.D. Mich. Oct. 4, 2013).

(Doc. 1 at 3-5.) David Clifton was at all relevant times a Corrections Security Inspector at Cooper Street Correctional Facility ("JCS") in Jackson, Michigan. (Doc. 11-2 at 1.) Mary Ann Bull-Ehinger has been Mental Health Services Unit Chief at JCS since August 3, 2011. (Doc. 11-3 at 1.)

Both Defendants move for summary judgment, arguing that (1) Plaintiff failed to properly exhaust the remedies available to him through the Michigan Department of Corrections' ("MDOC") Prisoner/Parolee Grievances Policy Number 03.02.130, and (2) Defendants are both entitled to qualified immunity. I suggest that Plaintiff did not properly exhaust his available remedies because none of his filed grievances alleged failure to prevent sexual assault/harassment as the "issue being grieved." (Doc. 11-5 at 6, 12, 16, 22, 30, 38.)  Further, he did not exhaust his available remedies with regard to Defendant Bull-Ehinger because none of the grievances identified her by name. Additionally, I suggest that both Defendants are entitled to qualified immunity because Plaintiff has not alleged sufficient facts to support his allegations that Defendants violated a clearly established constitutional right. *See Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (ruling that inmates have a clearly established constitutional "right to be free from deliberate indifference to assault and sexual abuse.").

## B.      Standard of Review

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of

showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**C.    Exhaustion of Remedies Law, Background and Analysis**

3

Defendants argue that Plaintiff failed to properly exhaust his remedies because none of the grievances that he filed stated that the "issue being grieved" was failure to prevent sexual harassment/assault. (Doc. 11-5 at 6, 12, 16, 22, 30, 38.) Plaintiff argues that he properly exhausted all remedies that were available to him. (Doc. 15 at 3.) The primary question is whether a plaintiff properly exhausts available remedies when the "issue being grieved" in the MDOC grievance is different than the allegations later made against the defendant in federal court. I suggest that a plaintiff does not properly exhaust under these circumstances.

### 1. Exhaustion of Remedies: Governing Law and Policies

Congress passed the Prison Litigation Reform Act of 1995 ("PLRA") "in response to a sharp rise in prisoner litigation in federal courts." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). By passing the PLRA, Congress attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] cases [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress equipped the PLRA with several mechanisms designed to reduce the quantity and increase the quality of the claims that came to federal court. *Id.* A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement: "No action shall be brought with respect to prison conditions under § 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000); *see also Woodford*, 548 U.S. at 84 ("A centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision.") (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). Courts consider the PLRA's suits 'brought with respect to prison conditions' to include "all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

The *Woodford* Court held that the PLRA's exhaustion of administrative remedies requires (1) that no remedies currently remain available, and (2) that the remedies that had been available to the prisoner were "properly" exhausted. 548 U.S. at 93. Prior to *Woodford* there were conflicting interpretations of the PLRA's exhaustion requirement. Some circuits interpreted the exhaustion requirement to mean that plaintiffs must have no more administrative remedies available before bringing their cases to federal court. *Id.* Others interpreted it to mean that plaintiffs must have "properly" exhausted their available remedies by following the agency's procedural requirements such as "deadlines and other critical procedural rules." *Id.*

In finding that exhaustion of remedies required "proper" exhaustion, the Court was persuaded by the "striking[]" similarities between the language of the PLRA and the doctrine of exhaustion in administrative law. *Id.* at 102. It also considered the purposes behind the exhaustion requirement, reasoning that an interpretation that did not require proper exhaustion would render the PLRA "toothless"–enabling a prisoner to bypass prison remedies by simply disregarding or ignoring deadlines. *Id.* at 95. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id.* at 90. Complaints and appeals must be filed "in the place, and at the time the prison's administrative rules require." *Id.* at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

In *Jones*, the Court instructs us to look to the prison's policy itself when determining "whether a prisoner has properly exhausted administrative remedies–specifically, the level of detail required in a grievance to put the prison and individual on notice of the claim." 549 U.S. at 205,

218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the *prison's requirements*, and not the PLRA, that define the boundaries of proper exhaustion." (emphasis added)). Specifically, the *Jones* Court was determining whether a Plaintiff needed to identify the Defendant by name during the initial grievance process. Since MDOC's policy at the time did not require that level of specificity the Court did not find that the PLRA required it. *Id.*[3]

A plaintiff does not need to show proper exhaustion as a part of their complaint. *Jones*, 549 U.S. at 216. Rather, failure to properly exhaust remedies is now an affirmative defense. *Id.* The *Jones* Court struck down the Sixth Circuit's procedural rule placing the burden on prisoners to plead and prove exhaustion in their complaint. *Id.* at 921.

**2. Application and Analysis**

**a. The Michigan Department of Corrections Grievance Policy**

The MDOC provides prisoners with a grievance procedure for bringing forward their concerns and complaints. *See* MDOC Policy Directive ("PD") 03.02.130 (eff. July 9, 2007). The MDOC's grievance procedure consists of steps that a prisoner must follow prior to filing a complaint in court, and each step is accompanied by a time limit. First, the grievant must attempt to resolve the issue with the person involved "within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control *or if the issue falls within the jurisdiction of the Internal Affairs Division* . . . ." MDOC PD 03.02.130(P) (emphasis added).

---

[3] The MDOC has subsequently changed its policy, requiring that in order to properly exhaust remedies plaintiffs need to identify all defendants in the initial grievance that they later name in the subsequent federal complaint. *See infra* Part II.C.2.

6

If the initial attempt to resolve the issue with the person involved is impossible or unsuccessful, the inmate must then submit a Step I grievance form within five days. MDOC PD 03.02.130(v). If the grievance is accepted, the prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(X). If the inmate is not satisfied with the response, or does not receive a response within fifteen days, he must file a Step II appeal within ten business days. MDOC PD 03.02.130(BB). Once again, if the inmate is dissatisfied with the response at Step II or does not receive a Step II response within fifteen days, he has ten business days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(FF). The Step III response concludes the administrative grievance process.

Any allegations of prohibited sexual conduct involving prisoners falls under the jurisdiction of the Internal Affairs Division. MDOC PD 03.03.140 (requiring the Internal Affairs Division to investigate allegations of prohibited conduct). To properly exhaust remedies, this policy explicitly requires that inmates file grievances through the above 03.02.130 grievance policy *in addition to* Internal Affairs investigations. *Id.*

### b. Grievances Filed by Plaintiff and the Internal Affairs Investigation

As evidence that Plaintiff failed to exhaust his remedies, Defense offers all six of Plaintiff's grievances filed from May 2009 to January 2014 that proceeded to Step III.(Doc. 11-5 at 2-3.) Grievance JCS-11-11-2011-19c was about a typewriter that was not returned to Plaintiff after his transfer to the Cooper Street Corrections Facility. (*Id.* at 36.) In the section of the Step 1 grievance form that asks "[w]hat attempt did you make to resolve this issue prior to writing this grievance?" Plaintiff wrote the following: "[o]n the above date [9-27-11] I informed Deputy Warden Riley that I did NOT have my Typewriter in the stack of [] property that was s[i]tting there for my transfer,

and that it was in violation of P.D. 04.07.112v." (*Id.* at 35.) Under the section "[s]tate problem clearly," Plaintiff began by citing several policies. (*Id.*) Then he wrote "Body of the Grievance" in a heading and followed it with "[a]ll of the above being listed as reference; on 9-27-2011, Julie Bridgewater did willfully violate P.D. 04.04.112v, by not transferring my typewriter with me to the next facility." (*Id.* at 38.) He then claims that the destruction of his typewriter was in retaliation for reporting Julie Bridgewater's "friend," Joell Morrill for sexual harassment. (*Id.*) He also states in the body of his grievance that he "hope[s] this matter is not ATTEMPTED to be swept under the rug like my sexual harassment and assault was at the hands of the staff at JCS." (*Id.*)

Grievance JCF-12-03-0589-19c dealt with stolen headphones. (*Id.* at 30.) In the body of the Grievance the Plaintiff said that the headphones might have been stolen in retaliation for complaining against Ms. Morrill. (*Id.*)

Grievances JCF-12-06-1380-17c and JCS-12-06-0569-19z also dealt with stolen property. (*Id.* at 16, 22.) In the section that asks "[w]hat attempt did you make to resolve this issue prior to writing this grievance," Plaintiff answered the following:

> This grievance is against the Michigan Department of Corrections; Kelly Sigler; . . . JCS Inspector Clifton; . . . Grievant can not present all names specifically because of an inability to access files and the aforementioned parties attempts at covering matters up. Grievant tried [to] resolve matters herein by sending written correspondence to Central office/Director's Office on 5-15-12, with no resolution. This is all information 'available' to grievant.

*Id.* In the "[s]tate problem clearly" section, Plaintiff stated the following:

> On 5-15-12, grievant tried to resolve an issue of departmental staff, collectively, withholding grievant's property, consisting of letters, photos and phone conversations, from Joell Morrill to/with grievant. Various departmental staff, including JCS Inspector Clifton, . . . has withheld personal property because of a supposed investigation into a sexual assault that occurred on grievant by psychologist Morrill. Grievant was once again ignored in trying to uncover specific facts to meet 42 USC 1997e(a) mandates. Grievant was sexually

8

assaulted repeatedly by Morrill[] over the course of over a year (2009-10), specific dates and times are not available because MDOC staff refuse to release not only grievant's personal property, e.g., personal logs, letters, pictures, cards, etc., but their investigative findings. Morrill[] tried to have grievant stabbed after her sexual assaults became the spotlight of investigation. Without the completed investigative reports from all parties grievant cannot meet grievance mandates. It is grievant's contention that, not limited to the aforementioned parties, MDOC staff are attempting to cover these matters up and not return or disclose specifics. Grievant was transferred from JCS because the MDOC's investigation into Morrill's sexual assaults, and later returned to JCS where grievant was again sexually assaulted by Morrill. MDOC personnel knew of these actions and continued to let such transpire and refuse to provide grievant with not only material relevant to proof, but any reports generated by parties to support these repeated sexual assaults transpired. Grievant pleads for specific dates, times, memos, reports. Resolution: Department staff provide grievant with enough information to meet 03.02.130.

(*Id.* at 21.)

The last two grievances, IBC-13-03-0616-27a and JCF-12-09-2075-28e, were completely unrelated to the alleged sexual assault. (*Id.* at 6, 12.) Respectively, they dealt with an alleged retaliation against Plaintiff for exercising his First Amendment rights and removal of his assignment at the "chowhall" in violation of his Due Process rights. (*Id.*)

Plaintiff reported the alleged sexual assault to David Clifton, who reported it to Internal Affairs. *See* (Doc. 11-2 at 1.) There was a subsequent Internal Affairs investigation that ended when the alleged assailant left the facility.[4] (Doc. 11-5 at 23.)

### 3. Exhaustion of Remedies Analysis

Before examining the MDOC grievances, it is important to recognize that Plaintiff could not have properly exhausted his remedies through the Internal Affairs investigation alone because that policy explicitly requires inmates to file a separate MDOC grievance in addition

---

[4] This might be in contravention of MDOC PD for Prohibited Sexual Conduct Involving Prisoners, which states in paragraph R that "[t]he investigation shall not be closed simply due to the resignation, transfer, or termination of the accused staff person." MDOC PD 03.03.140.

9

to the Internal Affairs investigation if they wish to properly exhaust remedies. MDOC PD 03.03.140.

*Woodford* and *Jones* require inmates to file grievances that conform to MDOC procedures in order to properly exhaust available remedies. 548 U.S. at 93; 549 U.S. at 218. The first question, then, is whether MDOC's policy requires an inmate to identify the 'issue being grieved' in his or her grievance. If it does, properly identifying the 'issue being grieved' is a part of MDOC's procedure which must be followed in order to properly exhaust available remedies.

The MDOC grievance policy provides: "The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." MDOC PD 03.02.130(R).

I suggest that the MDOC's policy requires that the grievant properly *identify* the 'issue being grieved' as the same issue that is subsequently complained about in federal court. Since the policy requires that all the information the grievant provides be "<u>facts</u>" that are relevant to the "issue being grieved" it follows that the grievant must first *identify* the 'issue being grieved.' This reading of the MDOC is not only reasonable, but is also bolstered by instructions to "[u]se a separate grievance form for each issue." (Doc. 11-5 at 21.)

The next question is whether Plaintiff identified the 'issue being grieved' in his grievances filed with MDOC as the same issue that he raises in his current complaint. In all of his grievances, Plaintiff identifies within the first few sentences what the 'issue being grieved' is and it is always something other than failure to prevent sexual assault/harassment. In

Grievance JCS-11-11-2011-19c, Plaintiff identified the 'issue being grieved' as a violation of the policy that required personnel to transfer his typewriter when he was transferred.  In Grievance JCF-12-03-0589-19c Plaintiff did not identify the 'issue being grieved' as failure to prevent sexual harassment/assault, but rather as headphones that were not returned to the Plaintiff. Plaintiff only mentions the sexual harassment complaint to suggest that the headphones may have been destroyed in retaliation. (Doc. 11-5 at 24.) Likewise, in Grievances JCF-12-06-1380-17c and JCS-12-06-0569-19z he identified the issue as wrongful withholding of property, not as failure to report sexual harassment/assault.  While Plaintiff mentioned the fact that sexual harassment occurred, he mentioned it only to explain why he believed his property was being withheld or destroyed.

Because none of the grievances filed by the Plaintiff have as their 'issue being grieved' failure to prevent sexual harassment/assault, and because MDOC policy requires proper identification of the 'issue being grieved,' Plaintiff did not properly exhaust his administrative remedies as required by *Woodford*. *See Ward v. Luckey*, No. 12-CV-14875, 2013 WL 5595350, at *2 (E.D. Mich. Oct. 11, 2013)(grievance was insufficient to exhaust with respect to claims asserted in the complaint where grievance complained that defendant called plaintiff into the library during his yard time and complaint alleged first amendment violation based on his right to access the library in retaliation for past grievances).

Alternatively, I also suggest that Plaintiff did not properly exhaust his remedies with respect to his complaint against Defendant Bull-Ehinger for the added reason that he did not name her in any of his MDOC grievances.  MDOC PD 03.02.130(R) ("Dates, times, places and names of all those involved in the issue being grieved are to be included.").  *Hall v. Warren*,

443 F. App'x 99, 106 (6th Cir. 2011)(Michigan plaintiff failed to exhaust administrative remedies against doctor where he failed to name doctor in grievance).

Plaintiff argues that he was unable to properly exhaust his 'available' remedies because of the actions of MDOC in withholding his property made the remedies unavailable to him. However, lack of exhaustion in the instant case is not based on Plaintiff's failure to file grievances; the instant Plaintiff filed several. Instead, lack of exhaustion is based on the contents of those grievances, i.e., that Plaintiff failed to properly identify the "issue being grieved." Therefore, any claims that he was prevented from exhausting his remedies is not relevant to the above findings.

I therefore suggest that the Defendants' motion for summary judgment should be granted because the Plaintiff has failed to properly exhaust his administrative remedies.

### D.   Alternative analysis - Qualified Immunity

Alternatively, Defendants move for summary judgment because they claim they are shielded from any liability by qualified immunity. (Doc. at 15.) Plaintiff asks that the Motion be denied because Defendants acted with deliberate indifference to the risk that he might be subjected to sexual assault/harassment. (Doc. 15 at 12.) The question is whether the Defendants acted with deliberate indifference to this risk. I suggest that the motion be granted because Plaintiff has failed to allege facts that show (1) the risk of harm was "sufficiently serious," and (2) Defendants knew of and disregarded "an excessive risk to inmate health or safety." *See Bishop*, 636 F.3d at 766.

### 1.   Qualified Immunity Governing Law

The defense of qualified immunity "can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994) (citing *Kennedy v. City of Cleveland*, 797 F.2d 297, 299-300 (6th Cir. 1986)). The defense generally shields government officials, acting within their discretion, from liability for civil damages as long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense of qualified immunity is raised, the burden rests with the plaintiff to show that the defendant is not entitled to qualified immunity. *Curry v. School Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 734 (E.D. Mich. 2006) (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

In general, when a defendant moves for summary judgment on the basis of qualified immunity, the analysis involves three inquiries:

> (I) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred"; (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known"; and (iii)[5] "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). Courts are no longer required to address these

---

[5] In *Saucier v. Katz*, the Supreme Court identified only two of these prongs. 533 U.S. 194, 201 (2001). The second prong, however, integrated the "objective legal reasonableness of an official's conduct, as measured by reference to clearly established law." *Id.* In *Dickerson v. McClellan*, the Sixth Circuit made the "objectively unreasonable" requirement a distinct third prong.

inquiries sequentially; instead a court may use its sound discretion to determine which of the prongs of the qualified immunity analysis should be considered first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In cases of sexual assault/abuse, the Sixth Circuit has recognized a "clearly established" constitutional right "to be free from deliberate indifference to assault and sexual abuse . . . ." *Bishop* 636 F.3d at 766. Therefore, each prong is established in sexual assault/abuse cases when there was deliberate indifference to the inmate's safety. *Id.* ("To establish a constitutional violation based on failure to protect, a plaintiff must show that prison officials acted with "deliberate indifference to inmate health or safety."). When evaluating a summary judgment motion, the question is whether "the facts viewed in the light most favorable to the plaintiffs show" that a violation of the clearly established constitutional right articulated in *Bishop* has occurred. *Radvansky*, 395 F.3d at 302; *see also Bishop*, 636 F.3d at 766.

In order to "raise a cognizable constitutional claim for deliberate indifference to an inmate's safety, an inmate must make a two part showing: (1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop*, 636 F.3d at 766 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the objective component, in order to support an allegation that there was a failure to protect, a plaintiff has to show that the risk of harm was ""sufficiently serious."" *Id.* (quoting *Farmer*, 511 U.S. at 833). The plaintiff must allege facts that show that he or she was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 833). For the subjective component in failure to protect cases, an "official is deliberately indifferent if he or she 'knows of and disregards an excessive risk to inmate health or safety.'"

*Id.* (quoting *Farmer*, 511 U.S. at 837). Whether a prison official "had the requisite knowledge . . . is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

The Supreme Court has clarified the interplay between qualified immunity and the summary judgment standards found in Rule 56(c) of the Federal Rules of Civil Procedure:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations omitted).

### 2. Relevant Background for Qualified Immunity Analysis

### a. Plaintiff's Complaint

Plaintiff alleged the following in his complaint:

> Joell Morrill sexually assaulted Plaintiff Gronski by means of anal sex; oral sex; vaginal sex; touching and verbally sexually assaulted Plaintiff Gronski. The last sexual assault occurred on or about September 14, 2011. Plaintiff Gronski throughout both tenures at JCS, and during the time in other facilities, endured physical and psychological sexual abuse at the hands of Joell Morrill.

> Defendant Clifton was the Institutional Inspector at JCS. Defendant Clifton ignored information presented to him throughout Plaintiff's tenures at JCS, and failed to act.

> Defendant Clifton displayed deliberate indifference to Morrill's unconstitutional acts . . . . Defendant Clifton knew Plaintiff Gronski was the

subject of sexual assault by Morrill and allowed Plaintiff to transfer back into JCS on or about September 13, 2011, and used Plaintiff as bait to catch Morrill in unconstitutional acts. Plaintiff was again sexually assaulted by Morrill on September 14, 2011.

Defendant Clifton set up video surveillance on or about September 14, 2011, having foreseeable suspicions of truth to the fact Plaintiff Gronski was, and had been, involved in sexual assaults. Defendant Clifton allowed the continuance of wrongful sexual acts taken against Plaintiff Gronski, displaying gross negligence and deliberate indifference by failing to act.

Defendant Mary Ann Bull-Ehinger was Unit Chief of Mental Health Services at JCS, and Psychologist Joell Morrill's supervisor. Prior to Plaintiff being sexually assaulted Defendant Mary Ann Bull-Ehinger was provided with information that Joell Morrill had committed volatile and unconstitutional acts against other patients (prisoners), and Defendant Bull-Ehinger did not document the information, or terminate Morrill from employment.

Defendant Bull-Ehinger, after being fully aware of Psychologist Morrill actions, failed to act when she had the opportunity and responsibility to do so. Defendant Bull-Ehinger ignored information, failed to file and report, was grossly negligent in supervising subordinate Morrill and    displayed deliberate indifference to Plaintiff Gronski, and others. If Defendant Bull-Ehinger would have taken immediate action concerning information of other prior victims, Plaintiff Gronski would have never been sexually assaulted by Joell Morrill.

(Doc. 1 at 4.)

### b. Defendant's Motion for Summary Judgment and accompanying exhibits

Defendant Clifton swore to the following in his affidavit:

At no time did I ignore the information Plaintiffs presented.

At no time did I receive any report that Plaintiff was sexually assaulted by Psychologist Joell Morrill.

That on September 26, 2011, Plaintiff reported that he was having an overly familiar relationship with Joell Morrill. . . .

That the Defendant at no time requested a transfer of Plaintiff Gronski to or from any MDOC facility.

That the Defendant was not aware that any sexual assault took place by Psychologist Joell Morrill against Plaintiff.

That once the Plaintiff informed the Defendant of the alleged rule violation, the Defendant initiated the steps to start an investigation.

That the Defendant never set-up or used video surveillance on September 14, 2011. The Defendant was not aware that the Plaintiff was the victim of any sexual acts performed on him by any State employee.

(Doc. 11-2 at 1-2.) Defendant Bull-Ehinger swore to the following in her affidavit:

I was appointed Unit Chief of Mental Health Services at Cooper Street on August 3, 2011. Joell Morrill was under my supervision from that date until a "Stop Order" was issued on September 27, 2011. Thus, I was Morrill's supervisor for only eight weeks. The "Stop Order" was issued after Plaintiff Gronski reported an "overly familiar" relationship with Morrill. . . .

Prior to the issuance of the "Stop Order," I had no knowledge that Joell Morrill had any sexual or other inappropriate contact with Plaintiff Gronski or any other prisoner. . . . During my approximately eight weeks as Morrill's supervisor, I never had any reason to believe that she was having an inappropriate relationship with Plaintiff or any other prisoner, and I certainly took no actions to encourage or condone such behavior. . . .

(Doc. 11-3 at 1-2.)

Exhibit 4 includes an email concerning Plaintiff's grievance about withheld property. (Doc. 11-4 at 23.) The email explains that while the vast majority of Plaintiff's property had been returned, some of the letters and pictures were kept as a part of the Internal Affairs investigation. (*Id.*) The email states that "[a]t the time of the investigation, the prisoner denied any type of sexual contact with the employee." (*Id.*) Plaintiff does not contest that he denied having sexual contact with Ms. Morrill in his Response.

### c. Plaintiff's Response to Defendant's Motion for Summary Judgment and Accompanying Exhibits

Exhibit A is an MDOC[6] Witness Interview of Defendant Bull-Ehinger dated February 23, 2012. (Doc. 15 at 22.) Also present at this interview was Defendant Clifton. (*Id.*) Ms. Bull-Ehinger said she received a notice in late September (she could not identify the exact date)[7] that there would be a Stop Order issued for Ms. Morrill. (*Id.*) She went on to say that "there had been two previous allegations regarding other inmates and Ms. Morrill that were being investigated at the time. (*Id.*) She assumed that [the Stop Order] had to do with one of these cases." (*Id.*) Defendant Bull-Ehinger was unable to recall specific information about these allegations. (*Id.*) The first allegation had to do with an inmate who had attempted suicide and had written a letter about his relationship with Ms. Morrill, which induced officials to recommend that the inmate not return to JCS after completing his time in acute care. (*Id.*) Defendant Bull-Ehinger's suspicion was raised about Ms. Morrill because when Ms. Morrill found out the inmate was not transferring back she became very upset and essentially "begged" to keep the inmate from transferring away from JCS. (*Id.*) Another allegation came from an inmate alleging that Ms. Morrill was "having a relationship with another inmate." (*Id.* at 23.) Ms. Bull-Ehinger stated that an investigation was "just getting started when the current issue with inmate . . . Gronski surfaced." (*Id.*) Exhibit A continues, indicating Defendant Clifton's knowledge level with the following: "David Clifton . . . was aware of these allegations but was unable to provide any detailed information about the allegations or recall inmate names." (*Id.*) Later it is noted that

> Clifton recalled concerns being raised in 2009, which he described as 'rumors' regarding Ms. Morrill's behavior towards Mr. Gronski but he was never able to confirm any of those suspicions. He reported that when Mr. Gronski returned to the facility, Ms. Morrill was seen meeting in a private conference room with the

---

[6] It appears that the prosecutor did not issue formal charges. (Doc. 11-5 at 23.)

[7] In her affidavit she noted that the Stop Order was issued on September 27, 2011. (Doc. 11-3 at 2.)

18

inmate for over an hour which raised suspicion, but again he did not have any solid leads for an investigation. He stated, "I just knew to keep an eye on it."

(*Id.*)

The report also showed that Ms. Morrill had requested that Plaintiff be transferred because she did not feel safe and thought Plaintiff was stalking her. (*Id.*) The Deputy Warden attempted to "get to the bottom of the issue" by talking to Plaintiff, who became upset and revealed that he was in a "consensual relationship" with Ms. Morrill. (*Id.*) Inspector Clifton came in during this meeting and Plaintiff told him "he had hundreds of letters from Ms. Morrill in his cell and provided Inspector Clifton with a cell phone number that later revealed several telephone conversations between Mr. Gronski and Ms. Morrill." (*Id.*) Defendant Clifton turned over the materials to the Internal Affairs Department the next day. (*Id.*)

Exhibit B is an Internal Affairs Report which includes a review of a September 14, 2011 video:

Related  video from 9/14/11 from a program building camera reviewed. GRONSKI and MORRILL met alone for over an hour on this date in a room in the program building:

12:11:25 CD with video begins

12:11:54 GRONSKI walks under camera into view in hallway–goes into room on right, (bathroom)

12:13:47 GRONSKI out and down hall–around corner to the left

12:14:51 GRONSKI returns up hall–sits down

12:17:53 Gets up and walks back down hallway–JOELL MORRILL appears down the hallway from the right–She's coming up hall–stops and talks to GRONSKI

12:18:51 They are out of view

19

12:19:52 This video ends

13:53:53 CD with video begins

13:56:22 GRONSKI into view from under camera

13:58:15 GRONSKI into room on right (bathroom)

13:59:31 GRONSKI out of bathroom–down hall to left

14:00:15 GRONSKI back up hall–sits down

14:00:56 GRONSKI back down hall

14:01:24 JOELL MORRILL appears from right at end of hallway–walks up hallway towards camera

14:01:54 MORRILL near camera–stops (appears GRONSKI called for her)–walks back towards him

14:02:11 MORRILL opens door on left (has large window on upper half of the door)–she and GRONSKI enter *Prisoners and uniform and civilian staff are continuously walking by this door while MORRILL and GRONSKI are in the room–some even looking in and showing no reaction–no report of inappropriate or physical contact.

15:53:18 MORRILL and GRONSKI exit–talk a few seconds in front of the door–she goes down the hall and turns to the right–he comes up the hallway towards the camera and out of view

15:55:48 MORRILL comes up hallway towards the camera and leaves.

(Doc. 15 at 34.)

Exhibit C includes an affidavit by the Plaintiff in which he swears to the following:

On or about February 5, 2009, until October 8, 2009, I was the subject of sexual assaults by Psychologist Joell Morrill. The last sexual assault occurred on or about September 14, 2011. . . . Joell Morrill indicated that she controlled my life, and my future. . . . Clifton questioned me about the sexual encounters between

Morrill and myself with threats of prosecution.[8] I advised David Clifton that I am not the perpetrator, but the victim. . . .

(Doc. 15 at 39.)

### 3. Qualified Immunity Analysis

Because Defendants contend that they are entitled to qualified immunity the burden falls on Plaintiff to show that a genuine issue of material fact exists as to whether Defendants are entitled to qualified immunity. *Silberstein*, 440 F.3d at 311. Defendants contend that they are entitled to qualified immunity because "Plaintiff has not supported his allegations [that Defendants were deliberately indifferent to the sexual assault/harassment] with sufficient evidence." (Doc. 11 at 19). Further, Plaintiff may not "rest on his pleadings," but must "support his allegations with sufficient evidence." *Scott*, 550 U.S. at 380. Since the Sixth Circuit found in *Bishop* a "clearly established" constitutional right "to be free from deliberate indifference to assault and sexual abuse . . . ," 636 F.3d at 766, the relevant question is whether Plaintiff supported his allegations that Defendants Clifton and Bull-Ehinger were "deliberately indifferent" to a "substantial risk of serious harm to an inmate with sufficient evidence. *Case v. Ahtow*, 301 F.3d 605, 605-06 (7th Cir. 2002). Deliberate indifference has an objective and a subjective component. *Farmer*, 511 U.S. at 834. The relevant inquiry for summary judgment purposes, then, is whether based on the facts alleged and taken in the light most favorable to Plaintiff, a rational trier of fact would be able to conclude that (1) "the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Id.* I suggest that Plaintiff did not meet his burden for either of these prongs for either Defendant.

---

[8] Plaintiff gives no indication of the date that Clifton questioned him. Since it deals with possible prosecution, it seems to correlate with the Internal Affairs investigation.

For the objective prong, in order to support an allegation that there was a failure to protect, a plaintiff has to show that the risk of harm was "sufficiently serious." *Bishop*, 636 F.3d at 766. The plaintiff must allege facts that show that he or she was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* While Plaintiff alleges that his mistreatment was objectively serious he cannot point to any evidence that supports his allegations that he was sexually harassed or abused. The letters and the cell phone only show that he corresponded with Joell Morrill, not that their relationship rose to the level of abuse/harassment. And a 'consensual relationship,' while not allowed by prison policy, does not rise to the level of sexual abuse/harassment. Additionally, there is evidence that Plaintiff denied that he was having any sexual contact with Ms. Morrill, and he does not refute this in his Response. Further, nothing in the video indicates that there was any sexual assault/harassment. The MDOC Witness Interview indicates that other inmates may have had a relationship with Ms. Morrill and one inmate had attempted suicide. However there is no indication that the suicide attempt had anything to do with the inmate's relationship with Ms. Morrill and so does not rise to the level of "sufficiently serious." While it is true that Ms. Morrill settled with Plaintiff, without statements or other evidence regarding the seriousness of the incarceration conditions, the fact that there was a settlement does not support allegations that the mistreatment was "sufficiently serious." Therefore Plaintiff has not supported his allegations with facts that show his alleged mistreatment was "sufficiently serious," so he does not meet the objective prong.

Likewise, Plaintiff has not properly supported his allegations that Defendants were deliberately indifferent with enough facts to show they knew of and disregarded "excessive risks" to his health or safety. *Id.* (citing *Farmer*, 511 U.S. at 837). Defendant Clifton stated in his

22

affidavit that "[a]t no time did I receive any *report* that the Plaintiff was sexually assaulted by Psychologist Joell Morrill." (Doc. 11-2 at 1-2.) Plaintiff contends that Defendant Clifton's statement is inconsistent with the MDOC Witness Interview. (Doc. 15 at 14.) To highlight this inconsistency, he points to the part of the Witness Interview where Ms. Bull-Ehinger notes that Clifton was aware of allegations regarding the other two inmates having relationships with Ms. Morrill. (*Id.* at 23.) He also points to the part of the Witness Interview that shows that Clifton turned over Plaintiff's recordings and letters to the Internal Affairs investigator the day after he was told about the 'consensual relationship.' (*Id.* at 23.) There is not a direct contradiction between Defendant Clifton's affidavit and the Witness Interview, however, because Clifton did not receive a 'report' and his knowledge was about other inmates–not the Plaintiff. Also, Clifton turned over recordings and letters after he found out about the 'consensual relationship' and it is reasonable to infer that when he said "at no time," he was referring to the period before he discovered about the relationship. Again there is also no contradiction because he did not receive a report (Plaintiff's notification of a 'consensual relationship' is not a report of sexual assault). Further, after he was put on notice that there was a 'consensual relationship' he reacted reasonably by reporting the matter to Internal Affairs as required by Internal Affairs Division procedures.

With regard to the 2009 rumors of Ms. Morrill's conduct that Defendant Clifton was never able to confirm, this does not rise to the level of "excessive risk to inmate health or safety." It was just a rumor of "Ms. Morrill's behavior towards Mr. Gronski," not a rumor of sexual assault/harassment. (Doc. 15 at 15.)

Defendant Bull-Ehinger stated in her affidavit that "[p]rior to the issuance of the 'Stop Order,' I had no knowledge that Joell Morrill had any sexual or other inappropriate contact with

Plaintiff Gronski *or any other prisoner*." (Doc. 11-3 at 3) (emphasis added). Plaintiff points to the MDOC Witness Interview as inconsistent with this statement. (Doc. 15 at 16.) The statement does appear to be slightly inconsistent because she had been made aware of allegations of improper relationships between Ms. Morrill and *other inmates*. (Doc. 15 at 22-23.) She had assumed that the Stop Order was addressing these allegations. (*Id.*) She also noted that an investigation into those allegations was just beginning. (*Id.*) However, despite the inconsistency, this does not rise to the level of an "excessive risk to inmate health or safety" for the same reason that the 2009 rumors did not rise to that level for Defendant Clifton. Rumors or allegations about sexual relationships are not the same as rumors/allegations of sexual assault/harassment. Additionally, even if Bull-Ehinger's knowledge rose to this level, she "reasonably responded" to the risk by initiating an investigation. *See Bishop v. Hackel*, 636 F.3d at 765 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm was not ultimately averted.").

### E.     Conclusion

For all the reasons stated above, I suggest that Defendants' Motion for Summary Judgment be **GRANTED**.

## III.    REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See*

*also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 12, 2014                      /S PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.  A hard copy was served by first class mail on Jeffrey Gronski, #294193, Bellamy Creek Correctional Facility, 1727 W. Bluewater Highway, Ionia, MI, 48846; and a hard copy was served on District Judge O'Meara in the traditional manner.

Date:  June 12, 2014                    By        s/Jean L. Broucek
                                        Case Manager to Magistrate Judge Morris